**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BHF CHICAGO HOUSING GROUP C LLC (ERNST) | ) | Case No. 20-16567 |
| | ) | |
| | ) | Hon. Jack B. Schmetterer |
| Debtor. | ) | |
| | ) | |

**REPLY IN SUPPORT OF ENTRY OF THE ORDER AUTHORIZING THE SALE OF THE PROPERTY OF THE DEBTOR FREE AND CLEAR OF ALL LIENS, CLAIMS AND INTERESTS TO THE SUCCESSFUL BIDDER AND GRANTING RELATED RELIEF**

BHF Chicago Housing Group C LLC (Ernst), debtor and debtor in possession (the "Debtor"), by and through its undersigned counsel, hereby files this *Reply* (the "Reply") *in Support of Entry of the Order Authorizing the Sale of the Property of the Debtor Free and Clear of all Liens, Claims, and Interests to the Successful Bidder and Granting Related Relief* (the "Sale Order"). In support of entry of the Sale Order, the Debtor respectfully states as follows:

### Introduction

The Court should enter the Sale Order and overrule the *Objection to Confirmation of Auction* [Docket No. 69] (the "Lucas Objection") filed on behalf Ebony Lucas, Kevina Bronaugh, Pat Dowell (3rd Ward Alderman), Leslie Hairston (5th Ward Alderman), Jeanette Taylor (20th Ward Alderman), Dearborn Realtist Board, and similar situated real estate investors and community property owners (collectively, the "Lucas Objectors") because the Lucas Objection is based solely in conjecture and belied by the actual facts related to the sale procedures, marketing process, Lucas' involvement in the sale, and the auction of the property.

1

The community issues raised in the Lucas Objection are critically important; however, nothing in the Lucas Objection provides the Court any indicia that any party was denied an opportunity to bid, individually or collectively, for the property.  In fact, the person representing the Lucas Objectors, Ms. Ebony Lucas ("Lucas"), was a member and attorney for an entity that submitted a bid for the property, deemed a qualified bidder, attended the auction for the property, and, on her own volition, chose to bid an amount $1,750,000 *less than* the successful bid. Furthermore, the successful bidder has exceptional ties to the City of Chicago and will work with local companies and organizations to ensure that the property and its development is deeply tied to benefit the community.

### Background Facts

On September 1, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor continues to manage its financial affairs as a debtor-in-possession. No trustee, examiner or committee has been appointed in this Chapter 11 Case.

The nature of the Debtor's business and the factual background relating to the Debtor's commencement of this Chapter 11 case is set forth in detail in the Declaration of Andrew Belew in Support of Chapter 11 Case (the "Declaration") filed on September 1, 2020 as ECF No. 4, and expressly incorporated herein by reference.

The Debtor's assets consist primarily of 17 separate buildings containing an aggregate of 181 affordable housing rental units located in the South Side of Chicago ("Property").  The Property is encumbered by certain bond financing documents to secure repayment of approximately $19,040,000.00, owed to UMB Bank, N.A., not individually, but solely as the duly-appointed and acting successor trustee under the Trust Indenture (the "Trustee").

2

**A.        The Bid Procedures and Marketing of Property**

On September 15, 2020, the Court entered the *Order (A) Approving Bid Procedures and Bid Protections, (B) Approving Notice of the Sale, (C) Scheduling a Sale Hearing and, if Necessary, an Auction, and (D) Granting Related Relief* [Docket No. 38] (the "Bid Procedures Order"). The Bid Procedures Order established November 3, 2020, as the deadline for submission of bids for the purchase of the Property, and November 5, 2020, as the date for an auction, in the event any qualified bids were received.

The Bid Procedures Order approved the stalking horse bid of PRE Holdings 15, LLC for the purchase of the Property in the amount of $4,500,000. Additionally, the Bid Procedures Order established the Bid Procedures to govern the marketing and sale process for the Property. The Bid Procedures sought offers for the Property, as a whole, and not in individual parcels. Additionally, each interested bidder was required to comply with the "City of Chicago Bid Requirements," and provide a detailed "Proposal" to the City of Chicago for the rehabilitation of the Property. Each Proposal was required to be pre-approved by the City of Chicago for a bidder to qualify as a "Qualified Bidder." Absolutely nothing in the Bid Procedures precluded an interested bidder from submitting a joint bid with other parties for the purchase of the Property. In fact, the successful bid in a related bankruptcy case was a *joint bid* between multiple parties for a portfolio of properties. *See* Case No. 20-12453, at Docket No. 88 (notice of auction results with joint bid being successful bid).

On September 22, 2020, the Court entered the *Order Authorizing the Retention and Employment of Hilco Real Estate, LLC as Real Estate Broker* [Docket No. 46] for Hilco Real Estate, LLC ("Hilco") to market the Property and solicit bids from interested parties. Hilco immediately undertook an aggressive and targeted marketing campaign to reach all potential

3

interested parties.  Each interested party was required to execute a "Virtual Data Room Access Form" to access the Debtor's due diligence information and data room (the "Access Form").

From September 1, 2020 through November 3, 2020, through Hilco's efforts, the Property was marketed to a substantial number of people and entities.  In total, over 100,000 impressions were made with interested parties. Through the trackable advertising media (webpage, digital, e-blast, etc.) over 18,893 confirmed parties viewed one of Hilco's marketing pieces, and 70 parties contacted Hilco directly via email or phone call.  From these parties, 40 prospective purchasers completed an Access Form and 33 of them spent time visiting the data room to access due diligence material.

**B.**    **Lucas and Lucas Objectors' Due Diligence of the Property**

On October 12, 2020, Sterling Howard (the brother and business partner of Lucas) requested and was granted access to the data room for prospective bidders.  A copy of the correspondence from Hilco to Mr. Howard is attached as **Exhibit 1**.  Shortly after being granted access to the data room, Mr. Howard was provided the contact information for the City of Chicago for potential "Proposal" approval.  A copy of the correspondence providing the City of Chicago information is attached as **Exhibit 2**.

That same day, October 12, 2020, Anthony Hardy, the broker previously selected by the housing court to market the Property ("Hardy") completed an Access Form to obtain the due diligence on behalf of "South Side Investors."[1]  A copy of Hardy's Access Form is attached as

---

[1] *See* Lucas Objection, at p. 3 ("During that process, a Black commercial real estate broker with Marcus and Millichap, Anthony Hardy, was selected to list the properties.").  It must be noted that the Debtor never received notice that Mr. Hardy would market the Property and no order was entered to that effect.  However, Mr. Hardy did receive notice of the bankruptcy sale and chose not to participate on his own behalf or any other purported state court interested parties.

4

**Exhibit 3**.  Hardy accessed the data room, including the opportunity to review the stalking horse

bid.  Yet, Hardy did not submit a bid for the Property on his own behalf or "South Side Investors."

Hardy did previously market the Property for the housing court and obtained offers for the

purchase of the Property.  However, contrary to the assertions set forth in the Lucas Objection, the

offers previously obtained had a value of $35,000 per unit, _not_ $63,000 per unit as asserted in the

Lucas Objection.[2]  The proposed sale to the successful bidder of the auction, BHF Acquisition,

LLC, provides a value of $13,000 _more_ per unit than the housing court offers supported in the

Lucas Objection.

Over a two-day period, on October 14-15, 2020, Lucas, her brother, and another business

partner (Jerome Wade) toured the Property with Hilco as part of the due diligence in the Bid

Procedures.  On October 20, 2020, Lucas, individually, accessed the data room and due diligence

documents for the Property.  A copy of the e-mail verification of her acceptance is attached as

**Exhibit 4**.  From October 12, 2020 (when the Lucas Objectors first obtained access to the data) to

November 3, 2020 (the bid deadline), the Lucas Objectors never raised any concerns with the

Debtor or Hilco about the Bid Procedures or inquired about making a joint bid for the Property.

**C.      Lucas Objectors' Qualified Bid and Auction Participation**

On November 3, 2020 (the "Bid Deadline"), Lucas and her brother, through an entity called

Portfolio Seventeen, LLC (the "Lucas Bidder") submitted a bid for the purchase of the Property

(the "Lucas Bid").  A copy of the e-mail from Lucas submitting the Lucas Bid is attached as

**Exhibit 5**.  The Lucas Bid appropriately contained a draft _Purchase and Sale Agreement_ setting

---

[2] The Debtor reached out to Marcus & Millichap today and requested a copy of the offers.  The Debtor will file the offers with the bankruptcy court upon receipt, if available, prior to the hearing.

DM_US 174504719-2.083118.0036
ClarkHill\98307\407363\261276140.v1-11/16/20

forth the terms of the purchase of the property, including a proposed purchase price of $4,790,000 (the "Lucas PSA").  A copy of the Lucas PSA is attached as **Exhibit 6**.

Per the Bid Procedures, the Lucas Bid also contained a Proposal that was pre-approved by the City of Chicago for the rehabilitation of the Property.  A copy of Lucas' Proposal is attached as **Exhibit 7**.  The Lucas Proposal asserted that "We are estimating an auction purchase sale of $9,500,000." Exhibit 7, at p. 9.  The Proposal also estimated rehabilitation costs of approximately $5,500,000 for the portfolio of Property.  *Id.*  The property at 4952 S. Vincennes was estimated to have rehabilitation costs of $60,000, while all other properties in the portfolio required, at least, $100,000 in repairs and some as high as $669,000.  Exhibit 7, at pp. 10-12.  The Lucas Bid was reviewed and approved by the City of Chicago.  Exhibit 7, at p. 19.  The Lucas Bid also had financing to cover a potential purchase price of $9,500,000 (as estimated in the Lucas Bid) and all rehabilitation costs.  Exhibit 7, at pp. 13-15.

On November 4, 2020, per the Bid Procedures, the Debtor, Hilco, Trustee, City of Chicago, and CNR Advisors met to review all the bids received and determine which bids were "Qualified Bids," invited to attend and participate in the auction.  It was determined that the Lucas Bid was a Qualified Bid.  That same day, Lucas was sent a *Notice of Qualified Bid* and invitation to participate in the auction.  A copy of the Notice of Qualified Bid sent to Lucas is attached as **Exhibit 8**.  Shortly thereafter, Lucas responded that she would attend the auction in-person and her brother, Sterling Howard, would attend the auction virtually.  A copy of the correspondence from Lucas is attached as **Exhibit 9**.

In total, in addition to the stalking horse bid, the Debtor received four (4) additional qualifying bids for the Property.  All five (5) qualifying bidders accepted the invitation to attend the auction in-person or virtually.

DM_US 174504719-2.083118.0036
ClarkHill\98307\407363\261276140.v1-11/16/20

On November 5, 2020, at 10:07 a.m., the auction was commenced live at the Hyatt Regency in Chicago and virtually via Zoom. A certified transcript of the auction is attached as **Exhibit 10**. Four of the qualified bidders, including Lucas, bid in-person at the auction and one of the bidders bid virtually via Zoom. Exhibit 10, at p. 2:10-19. Shortly thereafter, at 10:15 a.m., the active bidding at the auction began. Exhibit 10, at p. 7:4-9.

The Lucas Bidder did not immediately place an overbid for the Property. However, when the bidding reached $6,750,000, the Lucas Bidder placed a bid of $7,000,000 for the Property. Exhibit 10, at p. 8:3-5, 13-17. The Lucas Bidder's $7,000,000 bid was immediately overbid. Exhibit 10, at p. 8:19. Despite estimating the Property purchase price at $9,500,000, and having obtained adequate financing, the Lucas did not place another bid for the Property beyond $7,000,000. *See, generally,* Exhibit 10. The successful bid for the Property was $8,750,000. Exhibit 10, at p. 14:5-8. However, prior to declaring the successful bid, Hilco provided all parties in attendance, in-person or virtually, ample time to make an overbid or express any concern with the auction. Exhibit 10, at pp. 10-14. No party overbid the successful bid or objected to the auction process. *Id.* Lucas submitted a bid, was invited to attend the auction, participated in the auction, and chose not to raise an objection for the record at the auction.

### Reply in Support of Sale

The Court should overrule the Lucas Objection and enter the Sale Order because: (1) the Lucas Objection does not meet the standards required for a valid objection from an unsuccessful bidder for the Property; (2) the Bid Procedures did not preclude any party or parties from submitting a joint bid for the Property and Lucas herself submitted a solo bid for the Property; (3) the purchase price for the property is significantly more than any previously obtained offers for the sale of the Property and none of the previous offers contained detailed rehabilitation proposals;

7

and (4) the successful bidder for the Property has obtained the City of Chicago's approval for an extensive rehabilitation of the Property and will only use local, community-based companies to carry-out the rehabilitation and management of the Property.

**A.    The Lucas Objection Does Not Meet the Standards Required for a Valid Objection from an Unsuccessful Bidder for the Property**

The Court should overrule the Lucas Objection and enter the Sale Order because the Lucas Objection does not meet the standards required for a valid objection from an unsuccessful bidder for the Property.

Although the proponent of the sale bears the ultimate burden of persuasion when there is an objection, the objecting party "is required to produce some evidence respecting its objections." *In re Telesphere Communications, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1994) (quoting *In re Lionel Corp.,* 722 F.2d 1063, 1071 (2d Cir. 1983).  Where an objection is made, the standard to be applied by the court in approving a disposition of assets should be in the best interest of the estate. *See In re Schipper,* 933 F.2d 513, 515 (7th Cir. 1991) (sale under section 363 involves exercise of fiduciary duty and requires an "articulated business justification"); *In re Apex Oil Co.,* 92 B.R. 847, 866 (Bankr. E.D. Mo. 1988) ("Section 363(b)(1) mandates that the best interest of the estate be met by requiring any sale not in the ordinary course of business be: (1) for a fair and reasonable price, and (2) in good faith.").

The bankruptcy court reviews the Debtor's business judgment "to determine independently whether the judgment is a reasonable one." *In re Efoora, Inc.*, 472 B.R. 481, 488 (Bankr. N.D. Ill. 2012) (citing 3 *Collier on Bankruptcy* ¶ 363.02[4] at 363–18 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012)).  At the same time, the court "should not substitute its judgment for the [debtor's]." *Id.*  A debtor-in-possession has considerable discretion when it comes to the sale of

8

estate assets, and that discretion is entitled to "great judicial deference" as long as a sound business reason is given. *Efoora*, 472 B.R. at 488 *(citing In re State Park Bldg. Grp., Ltd.,* 331 B.R. 251, 254 (N.D. Tex. 2005); *In re Murphy,* 288 B.R. 1, 5 (D.Me.2002); *In re Gulf States Steel, Inc. of Ala.,* 285 B.R. 497, 516 (Bankr. N.D. Ala. 2002))

It is well-settled that a losing bidder at a section 363(b) auction may not object to a sale after the fact, on the premise that the bidding should be reopened so they can now enter a higher bid. *See, e.g., In re Bryan,* 2013 WL 4716194, at * 2 (Bankr. M.D. Ala. Sept. 3, 2013); *In re The Charter Co.,* 829 F.2d 1054, 1055 n. 1 (11th Cir. 1987) ("[R]eopening the bidding after the highest bidder has spent considerable time and money negotiating a contract could chill future interest in purchasing bankruptcy estate property."); *In re Stanley Eng. Corp.,* 164 F.2d 316, 321 (3rd Cir.1947) ("It cannot be tolerated that it be in the contemplation of [bidder] to wait until after the property has been struck off to the other, and then open the bidding and defer the sale by an increased offer.") (citations omitted); *In re Reading Broadcasting, Inc.,* 386 B.R. 562 (Bankr. E.D.Pa. 2008) (Courts have long concluded that the ability to achieve the highest price would be undermined if bankruptcy sales were not considered final at the conclusion of an auction). During a sale proceed, after an fairly conducted auction, that "a time must come when a fair bid is accepted and the proceedings are ended." *In re Webcor, Inc.,* 392 F.3d 893, 899 (7th Cir. 1968).

The Lucas Objection does not provide any evidence that the sale to the successful bidder is not in the Debtor's business judgment or that the auction was unfairly conducted. To the contrary, the Lucas Objectors, through Lucas, participated in all facets of the sale process. They were provided access to all of the due diligence, they toured the Property prior to submitting a bid, they submitted a bid, they were invited to participate in the auction, and they participated in the auction. At no point during the process did the Lucas Objectors raise any concern about the

9

process.  Furthermore, Lucas did not raise any concerns during the auction even after she bid materially less than the successful bidder.  The issues raised in the Lucas Objection are critically important; however, they are entirely controverted by the Lucas Objectors' extensive participation in the process and terms of the Bid Procedures.

The Lucas Objectors seek to improperly reopen the auction and, for that matter, the entire bid procedures so that the Lucas Bidders can submit an unsubstantiated bid in unknown amounts for 17 unidentified bidders.  The finality of the process and transition of the Property is of utmost importance to this Chapter 11 case and the sale process.  The Court should overrule the Lucas Objection because it fails, in every manner, to meet the requirements of an objection for an unsuccessful bidder under section 363(b) of the Bankruptcy Code.  The Court should enter the Sale Order, as proposed, and permit the transition of the Property to the Successful Bidder.

**B.  The Bid Procedures did not Preclude Any Party or Parties from Submitting a Joint Bid for the Property and Lucas Herself Submitted a Solo Bid for the Property**

The Court should overrule the Lucas Objection because the Bid Procedures did not preclude any party or parties from submitting a joint bid for the property and Lucas, herself, chose to submit a solo bid for the Property.  The Lucas Objection incorrectly concludes that that "portfolio sale requirement, [sic] created a major barrier . . . by preventing meaningful participation by individuals representative of the communities where the properties are located."  Lucas Objection, at p. 1.  This conclusion is belied by the Bid Procedures, Lucas' own proposal for the Property, and the reality of 17 separate sales.

First, the Lucas Objection is incorrect because absolutely nothing precluded the joint bid of "individuals representative of the communities" for specific parcels of the Property.  The Bid Procedures sought a bid for the entire portfolio of the Property; however, nothing in the Bid

10

Procedures prevented "individuals representative of the communities" from joining together to make a joint bid for the Property.  In fact, this is precisely what occurred in the related case of *In BHF Chicago Housing Group B LLC (Icarus)*, Case No. 20-12453, at Docket No. 88 (notice of auction results with joint bid being successful bid).  The parties that the Lucas Objection generally refer to were not barred from submitting a joint bid for the Property.  Additionally, Hilco, in its extensive marketing of the Property, reached out to numerous "individuals representative of the communities," including, without limitation, Hardy, the former state court broker and representative of South Side Investors. *See* Exhibit 3.

Second, the Lucas Bid also belies the arguments raised in the Lucas Objection.  The Lucas Objection asserts that parties were precluded from participating in the auction.   While this argument is simply not true, nothing prevented Lucas from obtaining the Property and conducting her own subsequent or simultaneous dissemination of the assets.  Lucas' Proposal estimated that the Property was worth $9,500,000, or $53,000 per unit, and she also had the funding for such a purchase.  She also asserted that the Property could be sold in individual parcels for $63,000 per unit.  Lucas Objection, at p. 4 ("This amount is significantly les than the $63,000 per unit that the debtor could have sold the buildings for if they had been sold separately").  Nothing in the Bid Procedures prevented the Lucas Objectors from bidding $9,500,000, as set forth in the Lucas Bid, and subsequently selling the Property for $63,000 per unit.  Lucas chose only to bid $7,000,000, and placed no further bids for the Property.  The Lucas Objectors had the opportunity to bid more and chose not to do so.

Finally, the Lucas Objection fails to recognize the impact of seventeen (17) separate sales on the bankruptcy estate.  In the event the Debtor did, in fact, conduct 17 separate sales for the Property, this would entail 17 separate closings with 17 separate parties with 17 separate attorneys.

11

This would significantly increase the costs and time of the bankruptcy estate and its professionals and, unquestionably, reduce the return to creditors. Additionally, if 17 separate sales were to take place, the City of Chicago would have to review and compare (at least) 17 different "Proposals" for rehabilitation of the individual parcels. Beyond all of these substantive concerns, there is nothing that would have precluded an outcome where a "large conglomerate" bid more than any individual bids. There is no evidence to support the Lucas Objection and, in fact, the Bid Procedures did permit separate entities to submit a joint bid for the Properties.

The Court should overrule the Lucas Objection and enter the Sale Order because the Bid Procedures did not preclude any party or parties from submitting a joint bid for the property and Lucas, herself, chose to submit a solo bid for the Property.

**C.      The Purchase Price for the Property is Significantly more than any Previously Obtained Offers and it Contains a Detailed Rehabilitation Proposal**

The Court should overrule the Lucas Objection because the purchase price of $8,750,000 for the Property is significantly more than any previously obtained offers and it contains a detailed rehabilitation Proposal.

The Lucas Objection makes the unsupported allegation that "[t]he purchase price of the auction was considerably less than offers received for the same properties when offered for sale individually." Lucas Objection, at p. 2. However, the Lucas Objection fails to provide any evidence of higher offers and wrongly asserts that "Hardy showed the properties to 47 investors and received 17 cash offers for an average of $63,000." This allegation is simply false. Hardy received offers of only $35,000 per unit or *$13,000 less per unit* than the successful bidder. The Lucas Objection provides absolutely no evidence of higher bids or anything to substantiate its allegations. While Hardy may have contacted 47 investors, which is unsubstantiated, Hilco

12

received interest from more than 70 investors, *including Hardy himself*.  No party submitted a bid, joint or otherwise, that exceeded the successful bid.

Moreover, if the Lucas Objectors truly believed the successful bid was too low, there was absolutely nothing to prevent them from bidding higher than $8,750,000 at the auction.  Lucas was a qualified bidder at the auction with financing to support a bid up to $10,000,000.  *See* Exhibit 7, at pp. 14-15.  The Lucas Objectors had the opportunity to raise the purchase price of the Property well-beyond the $8,750,000 successful bid; however, they chose to only bid $7,000,000 for the Property.  Exhibit 10, at p. 8:13-17.  If the Lucas Objectors truly believed that value was left at the auction, they were in a prime position to raise the successful bid and obtain the Property for more than $8,750,000.  They chose not to do so and the successful bid is the highest and best bid received for the Property.  Nothing in the Lucas Objection provides any evidence to the contrary.

The Court should overrule the Lucas Objection because the successful bid for the Property is the highest and best bid received.  The Court should enter the Sale Order and allow the transition of the Property to move forward.

**D.      The Successful Bidder for the Property will only use Local, Community-Based Companies to Carry-Out the Rehabilitation and Management of the Property**

The Court should overrule the Lucas Objection because the successful bidder for the Property will only use local, community-based companies to carry-out the rehabilitation and management of the Property.  Per the "Proposal" of the successful bidder [Docket No. 62, at Exhibit B], the successful bidder is in partnership with McLaurin Development Partners (MDP), a local minority owned real estate company with a stellar track record developing projects in the Southside community and working with Aldermen and City of Chicago.  The MDP partnership demonstrates the successful bidder's vested interest in preserving and growing value in the

DM_US 174504719-2.083118.0036
ClarkHill\98307\407363\261276140.v1-11/16/20

community.  The successful bidder and MDP have a significant local presence and critical community relationships.  MDP has a history of inclusionary processes that provide opportunities for local minority firms, and these programmatic efforts will continue with the MDP partnered acquisition of the Property.  The Lucas Objection fails to even mention this strong connection to the neighborhood.  The Court should overrule the objection because the successful bidder for the Property will only use local, community-based companies to carry-out the rehabilitation and management of the Property, and has a strong history and connection with the neighborhood.

## <u>Conclusion</u>

The immediate transition of the Property to the well-capitalized successful bidder, who submitted the highest and best bid at the auction, is in the best interest of the estate and Debtor's business judgment.  The Lucas Objection is simply asking the Court to reopen the auction (and sales procedures) to permit Lucas to conjure a bid that has no basis in fact or evidence.  The Lucas Objectors participated in the auction and refused to submit a bid greater than the successful bid. The finality of this process is critical to transfer the Property so that it may be rehabilitated for the benefit of current and future tenants.  For the reasons set forth above, the Court should overrule the Lucas Objection and enter the Sale Order.

Dated: November 16, 2020

Respectfully submitted,

**BHF CHICAGO HOUSING GROUP C LLC (ERNST)**

By: *Kevin H. Morse* .
      One of Its Attorneys

Scott N. Schreiber (#06191042)
Kevin H. Morse (#06297244)
Samuel J. Tallman (#06322843)
CLARK HILL PLC
130 East Randolph Street | Suite 3900
Chicago, Illinois 60601

14

T: (312) 985-5595 | F: (312) 985-5984
sschreiber@clarkhill.com
kmorse@clarkhill.com
stallman@clarkhill.com

DM_US 174504719-2.083118.0036
ClarkHill\98307\407363\261276140.v1-11/16/20