*EXECUTION VERSION*

# REAL ESTATE PURCHASE AND SALE AGREEMENT

THIS REAL ESTAE PURCHASE AND SALE AGREEMENT ("**Agreement**") is entered into as of November 3, 2020 ("**Effective Date**"), by and between BHF Chicago Housing Group C LLC, an Illinois limited liability company (the "**Seller**") and _Portfolio Seventeen, LLC__, an _Illinois Limited Liability Company,__ (the "**Purchaser**"), and approved by UMB Bank, N.A., not individually, but solely in its capacity as the duly-appointed and acting successor trustee (the "**Trustee**") under the indentures for the Multifamily Housing Revenue Bonds (Better Housing Foundation Ernst Portfolio Project), Series 2018A-1 ("**Series 2018A-1 Bonds**"),  Multifamily Housing Revenue Bonds (Better Housing Foundation Ernst Portfolio Project), Taxable Series 2018A-2 ("**Series 2018A-2 Bonds**"), and Multifamily Housing Revenue Bonds (Better Housing Foundation Ernst Portfolio Project), Subordinate Series 2018B ("**Series 2018B Bonds**").

WHEREAS, Seller is the owner of fee simple title to certain parcels of real property as set forth on **Exhibit A**, attached hereto, all in Chicago, Illinois, together with all improvements thereon, if any (collectively the "**Property**");

WHEREAS, the Property is subject to and secured by a series of bonds issued by the Illinois Finance Authority (Series 2018A-1 Bonds, Series 2018A-2 Bonds and Series 2018B Bonds (collectively, the "**Bonds**")) and the Trustee is the duly-appointed and acting successor trustee under the indentures for the Bonds.  The Seller and Purchaser acknowledge that the liens of the Trustee securing the Bonds against the Property are valid liens;

WHEREAS, on September 1, 2020, Seller filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of Illinois (the "**Bankruptcy Court**") that commenced Case No. 20-16567 (the "**Bankruptcy Case**"); and

WHEREAS, Seller desires to sell the Property to Purchaser, and Purchaser desires to purchase such Property from Seller, subject to the terms and conditions of this Agreement (the "**Sale**");

NOW, THEREFORE, in consideration of the premises and the mutual covenants set forth in this Agreement, Seller and Purchaser agree as follows:

1. <u>Incorporation of Recitals</u>.  The Recitals to this Agreement are hereby incorporated into and made a part of this Agreement.

2. <u>Purchase Price and Terms of Payment</u>.  The purchase price ("**Purchase Price**") for the Property is __Four Million Seven Hundred Ninety Thousand_ ($_4,790,000__) DOLLARS.  The Purchase Price shall be paid by Purchaser as follows:

(a) Purchaser has already deposited $_239,500__ ($_TWO HUNDRED THIRTY NINE THOUSAND FIVE HUNDRED__) DOLLARS (the "**Deposit**") in an escrow account identified and established by the Seller (the "**Escrow Account**").  Within two (2) business days of the Effective Date, Purchaser shall make an additional cash deposit to the Escrow Account in an amount necessary to raise the Deposit to equal five percent (5%) of the Purchase Price.

(b) At Closing (as defined herein below), the entire Deposit shall be credited against the Purchase Price, and the balance of the Purchase Price shall be paid to Seller by cash or certified funds; provided, however, that the Purchase Price shall be adjusted to reflect the prorations between Purchaser and Seller set forth in the Agreement.

3. <u>Possession</u>. Possession of the Property shall be delivered to Purchaser on the Closing Date (as defined herein), subject only to the Permitted Exceptions (as defined herein) and discharge of the Receivers (as defined herein).

4. <u>Sale Order</u>. The Sale Order shall be in form and substance satisfactory to Seller, Purchaser, City of Chicago, and the Trustee, and shall include the following provisions, among others:

(a) Approving the Sale of the Property to Purchaser on the terms and conditions set forth in this Agreement pursuant to Section 363(f) of the Bankruptcy Code free and clear of any and all liens, claims, charges, and encumbrances, except for the Permitted Exceptions, and authorizing Seller to proceed with the Sale;

(b) Overruling objections filed with respect to the Sale of the Property that have not been withdrawn;

(c) Finding that the Purchase Price (as defined in <u>Section 2</u> herein) represents fair value for the Property;

(d) Finding that the Sale is in the best interests of Seller's estate;

(e) Finding that Purchaser is a good faith purchaser of the Property under Section 363(m) of the Bankruptcy Code and that the provisions of Section 363(n) of the Bankruptcy Code have not been violated;

(f) Providing that the Purchase Price, less the Deposit, shall be paid by Purchaser to Seller immediately upon, and contemporaneous with the closing of the Sale, and such proceeds shall be deposited by Seller in a U.S. Trustee approved depository;

(g) Except for the establishment of an administrative claim fund (to be set forth in a motion filed in the Bankruptcy Case), the Break-Up Fee, Expense Reimbursement, and the Deposit, all liens, claims, encumbrances and interests on the Property shall attach to the Purchase Price and any other proceeds from the Sale with the same force, effect, validity and priority as such liens, claims, encumbrances and interests had on such Property prior to the closing of the Sale;

(h) Providing that Receivers' expenses which are allowed or authorized by any court or authority under applicable law shall attach to the Purchase Price and any other proceeds from the Sale with the same force, effect, validity and priority as provided by law, including, without limitation, all expenses incurred following the filing of the Bankruptcy Case;

(i) Providing that the Bankruptcy Court shall retain jurisdiction, among other things, for the purpose of enforcing the provisions of the Sale Order including, without limitation, compelling delivery of the Property to Purchaser and protecting Purchaser against any liens, claims, encumbrances, or interests against Seller or the Property not expressly assumed under this Agreement;

(j) Providing that, following closing of the Sale, the Circuit Court of Cook County shall have jurisdiction to enforce all approved plans and the Proposal (as defined in paragraph 8(a) below) for the rehabilitation of the Property and remediation of any existing building code violations, in addition to any other remedy to which the City of Chicago is entitled at law or in equity;

(k) Finding that no brokers' commissions are due from Purchaser with respect to the Sale;

(l) Providing that the Receivers shall promptly turnover control and possession of the Property to Purchaser following the Closing

(m) Providing that the parties hereto shall be authorized to close the Sale immediately upon the Sale Order becoming final and non-appealable;

(n) Authorizing and directing Seller to execute, deliver, perform under, consummate and implement the Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing; and

(o) Determining that the transfer of the Property to Purchaser does not cause Purchaser to be a successor to and/or the alter ego of Seller or otherwise liable for any liabilities or assets excluded from assumption or purchase under this Agreement and permanently enjoining each and every holder of any of such excluded liabilities from commencing, continuing, or otherwise pursuing or enforcing any remedy, claim, cause of action or encumbrance against Purchaser or the Property related thereto.

5. <u>Termination.</u> Except as otherwise set forth in this Agreement, this Agreement shall terminate, and Purchaser shall receive a return of the Deposit, only upon the following:

(a) the Sale Order has not been approved within forty-five (45) days after the Effective Date unless such date is extended by consent of the Purchaser and the Trustee; provided, however, that if Purchaser is selected as the back-up bidder at the conclusion of the auction, then this Agreement shall remain irrevocable and not terminate until sixty (60) days after entry of the Sale Order approving the sale to the winning bidder; or

(b) if at any time prior to the Closing of the Sale, the Property shall be destroyed or materially damaged (meaning any damage the cost of which to repair objectively exceeds $500,000.00) by weather, wear or acts of vandalism or theft, fire or other casualty, or the Property is taken by condemnation, then Purchaser shall have the option of terminating this Agreement (and receiving a return of its Deposit) or accepting the Property as damaged or destroyed, together with the proceeds of any award or insurance payable, which gross proceeds, Seller agrees to assign to Purchaser and deliver to Purchaser at the Closing.

6. <u>Receivership of Property</u>. This Agreement shall not be terminated or otherwise modified, altered, or affected (and Purchaser shall not be excused from the exercise and performance of any and all conditions and terms set forth in this Agreement) if the Bankruptcy Court allows any receiver duly appointed under any applicable law and by any applicable authority (collectively, the "**Receivers**") to remain in place or in control of any or all of the Property during the Bankruptcy Case. The Purchaser acknowledges that certain individual properties that comprise the Property may have been sold or transferred, within the period prior to the Bankruptcy Case filing, by or through the

Receivers or respective state court proceeding (each, a "**Sold Property**"). The Purchaser may elect to proceed with the Sale, without the Sold Property, and the Purchase Price shall be adjusted to reflect the value of the Sold Property as agreed to by the parties to this Agreement or, alternatively, terminate this Agreement and receive a return of the Deposit. Nothing herein nor any election of the Purchaser shall be deemed an admission or waiver of any right or defense the Seller has to any potential state court sale or Receiver sale of any Sold Property, including, without limitation, a violation of due process and avoidance and recovery under Chapter 5 of the Bankruptcy Code. Purchaser acknowledges that prior to Closing the Receivers control the Property and shall have the sole discretion to enter into new leases and modify or extend existing leases without Purchaser's consent.

7. Inspection. (a) Purchaser hereby agrees to indemnify, defend and hold Seller, its partners, shareholders, members, managers, owners and affiliates and their respective officers, managers, directors, employees, agents and representatives harmless from and against any and all liens, claims, causes of action, damages, liabilities and expenses (including reasonable attorneys' fees) arising out of Purchaser's Inspections or tests or any violation by Purchaser of the provisions of this Agreement. All costs related to Purchaser's Inspections or tests or otherwise set forth herein shall be borne by Purchaser, regardless of whether the Sale to Purchaser is consummated. Purchaser expressly agrees that the indemnity set forth herein shall be a continuing obligation of Purchaser and shall survive the Closing or termination of this Agreement.

(b) Purchaser shall not have the benefit of an inspection or similar contingency. This Agreement shall continue in full force and effect and Purchaser shall be deemed to approve the condition of the Property.

8. City of Chicago Requirements; Third Party Beneficiary. (a) Purchaser has provided the Seller, City of Chicago, Department of Law (Attn: Greg Janes) and Trustee with: (i) proof of access to funds to rehabilitate the Property; (ii) a proposal for rehabilitation of the Property and a plan to bring the Property into full compliance with the Municipal Code of Chicago (the "**Proposal**") within a reasonable time from the Closing Date with specific benchmarks for achieving such compliance; and (iii) either (1) allow tenants to remain at the Property for at least 90 days or for the term of their lease, whichever is greater; or (2) provide Relocation Assistance (collectively, the "**City of Chicago Requirements**"). For the purposes herein, "**Relocation Assistance**" shall mean referrals to comparable and suitable replacement properties at market affordable rent and the reimbursement of reasonable and documented costs, including an application fee, security deposit and moving costs, not to exceed $1,500 in aggregate per unit, related to the involuntary relocation of a tenant prior to the expiration of ninety (90) days from the Closing Date of the Sale or the term of the lease, whichever is greater. No Relocation Assistance shall be provided if a tenant voluntarily vacates a unit prior to or upon the expiration of the aforementioned ninety (90) day period or the term of their lease.

(b) If Purchaser fails to comply with the requirements set out in Section 8(a), whether prior to or after the Closing, the City of Chicago, Department of Law (Attn: Greg Janes), shall be entitled to enforce, as a third-party beneficiary of this Agreement, the City of Chicago Requirements in the Circuit Court of Cook County.

(c) The City of Chicago, Department of Housing (Attn: Greg Janes), shall be entitled to enforce all approved plans and the Proposal for the rehabilitation of the Property and remediation of any existing building code violations set forth in this Agreement, as a third party beneficiary of such

4

plans and proposals, in the Circuit Court of Cook County, in addition to any other remedy to which the City of Chicago is entitled at law or in equity.

9. <u>Purchaser's Designation of Assumed Service Contracts</u>. To the extent that any management, brokerage, leasing or other service contract (including, without limitation, all cable, internet, telephone, satellite, cell tower and other telecommunications contracts, together with any access and/or marketing agreements), equipment, labor or materials contracts, maintenance or repair contracts, or other agreements that are in force and effect and affect the Property or the management, leasing, operation, repair, or maintenance thereof (collectively, "**Service Contracts**") exists, on or prior to that date which is seven (7) days after the Effective Date, Purchaser shall send written notice to Seller designating which Service Contracts, if any, Purchaser desires to have Seller assume or reject pursuant to Section 365 of the Bankruptcy Code. Seller shall then serve written notice to each counterparty to a Service Contract (the "**Service Contract Notice**"), as approved by the Bankruptcy Court, of Purchaser's intent to assume or reject such Service Contracts, and such assumed Service Contracts shall be the "**Assumed Service Contracts**" to be assigned to Purchaser at Closing (and if Purchaser fails to make such designation, Purchaser shall be deemed to reject any such Service Contract). Purchaser shall be responsible for paying all amounts necessary to assume the Service Contracts and cure any defaults under the Assumed Service Contracts under Section 365 of the Bankruptcy Code and any other applicable law or authority (the "**Cure Amounts**") and for satisfying any requirements regarding adequate assurance of future performance that may be imposed under Section 365(b) of the Bankruptcy Code. Seller shall have no further responsibility for the payment of the Cure Amounts. Seller shall include in the Service Contracts Notice all proposed Cure Amounts and a deadline for any objection to the Cure Amount or assumption/rejection of any Service Contracts.

10. <u>No Representations or Warranties; AS IS Condition</u>. (a) Purchaser warrants, acknowledges and agrees with Seller that Purchaser is purchasing the Property in its "AS IS/WHERE IS" condition, "WITH ALL FAULTS" and with all physical latent or patent defects, and specifically and expressly without any warranties, representations or guarantees, either express or implied, of any kind, nature or type whatsoever from or on behalf of the Seller. Purchaser acknowledges that Purchaser has not relied and is not relying upon any information, document, sales brochures or other literature, maps or sketches, projection, pro forma statement, representation, guarantee or warranty (whether express or implied, or oral or written, material or immaterial) that may have been given by or made by or on behalf of the Seller or Trustee. Purchaser further acknowledges (i) that the Purchase Price may reflect deferred maintenance, and (ii) that Seller and Trustee are generally not familiar with the condition of the Property.

(b) Purchaser hereby acknowledges that it shall not be entitled to information pertaining to, and shall not rely on the Seller, the Trustee or their agents as to (i) the quality, nature, adequacy or physical condition of the Property including, but not limited to, appurtenances, access, landscaping, parking facilities, sewage or utility systems, or facilities at the Property, if any; (ii) the quality, nature, adequacy or physical condition of soils or ground water at the Property; (iii) the existence, quality, nature, adequacy or physical condition of any utilities serving the Property or available at its boundaries; (iv) the development potential of the Property, its habitability, merchantability of fitness, suitability or adequacy of the Property for any particular purpose; (v) the zoning or other legal status of the Property, including but not limited to, condemnation or threat of condemnation; (vi) the Property's operational compliance with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions or restrictions of any governmental or quasi-governmental entity; (vii) the Property's operational compliance with any applicable labor laws or building codes concerning labor

and material used or incorporated into the Property or any other labor or materials relating in any way to the Property; or (viii) the condition of title to the Property or the nature, status and extent of any right of way, lease, right of redemption, possession, lien, encumbrance, license, reservation, covenant, condition, restriction or any other matter affecting title to the Property except as may be set forth in the owner's policy.

(c)     Purchaser acknowledges and agrees with Seller and Trustee that, with respect to the Property, Seller and Trustee have not, do not, and will not make any warranties or representations, express or implied, or arising by operation of law, including, but in no way limited to, any warranty of condition, merchantability, habitability or fitness for a particular use, or with respect to the value, profitability or marketability of the Property.  Purchaser acknowledges that Seller and Trustee have not, do not, and will not make any representation or warranty with regard to existence or non-existence at any time of hazardous waste or substances in the Property or on, at or under the surface of the Property or with regard to compliance with any environmental protection, pollution or land use laws, rules, regulation, orders or requirements including, but not limited to, those pertaining to the handling, generating, treating, storing or disposing of any hazardous waste or substance, lead based paint or radon.

(d)     Purchaser acknowledges that it was Purchaser's responsibility to undertake such due diligence and to make such legal, factual and other inquiries and investigations as Purchaser deemed necessary, desirable or appropriate with respect to acquiring the Property.  Such inquiries and investigations could have included, but were not be limited to, any oral or unrecorded leases and contracts pertaining to the Property, the physical components of all portions of the Property, the condition of the Property (including the existence of any hazardous or toxic wastes or other contaminants), the existence of any wood destroying organisms on the Property, such state facts as an accurate survey and inspection would show, the present and future zoning ordinances, resolutions and regulations of the city, county and state where the Property is located and the value and marketability of the Property.

11.     WAIVER AND RELEASE OF CLAIMS. PURCHASER ACKNOWLEDGES AND AGREES THAT THERE ARE NO ORAL AGREEMENTS, WARRANTIES OR REPRESENTATIONS RELATED TO OR AFFECTING THE PROPERTY BY SELLER OR TRUSTEE, ANY AGENT OF SELLER OR TRUSTEE OR ANY THIRD PARTY. PURCHASER AND ANYONE CLAIMING BY, THROUGH OR UNDER PURCHASER, EACH HEREBY FULLY RELEASES SELLER AND TRUSTEE, THEIR SUBSIDIARIES, AFFILIATES, EMPLOYEES, OFFICERS, DIRECTORS, REPRESENTATIVES, ATTORNEYS, PARTNERS, AND AGENTS FROM ANY AND ALL CLAIMS THAT IT MAY NOW HAVE OR HEREAFTER ACQUIRE AGAINST SELLER OR TRUSTEE AND THEIR SUBSIDIARIES, AFFILIATES, EMPLOYEES, OFFICERS, DIRECTORS, REPRESENTATIVES, ATTORNEYS, PARTNERS, AND AGENTS FOR ANY COSTS, LOSS, LIABILITY, DAMAGE, EXPENSE, DEMAND, ACTION OR CAUSE OF ACTION ARISING FROM OR RELATED TO OPERATION OF THE PROPERTY OR ANY CONDITION OF THE PROPERTY INCLUDING BY NO WAY OF LIMITATION CONSTRUCTION DEFECTS, ERRORS, OMISSIONS, OR OTHER CONDITIONS AFFECTING THE PROPERTY (THE "**RELEASED CLAIMS**"). PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT THIS RELEASE OF THE RELEASED CLAIMS SHALL BE GIVEN FULL FORCE AND EFFECT ACCORDING TO EACH OF ITS EXPRESSED TERMS AND PROVISIONS, INCLUDING, BUT NOT LIMITED TO, THOSE

RELATING TO UNKNOWN AND UNSUSPECTED CLAIMS, DAMAGES, AND CAUSES OF ACTION. THIS COVENANT RELEASING SELLER AND TRUSTEE FROM THE RELEASED CLAIMS SHALL BE A COVENANT RUNNING WITH THE PROPERTY AND SHALL BE BINDING UPON PURCHASER AND ALL SUBSEQUENT OWNERS OF THE PROPERTY OR ANY PART THEREOF. PURCHASER FURTHER UNDERSTANDS THAT SELLER OR SOME OF SELLER'S PREDECESSORS IN INTEREST MAY BE OR BECOME INSOLVENT, BANKRUPT, JUDGMENT PROOF OR OTHERWISE INCAPABLE OF RESPONDING IN DAMAGES, AND PURCHASER MAY HAVE NO REMEDY AGAINST SELLER OR TRUSTEE OR SUCH PREDECESSORS, CONTRACTORS OR CONSULTANTS. THIS WAIVER AND RELEASE OF THE RELEASED CLAIMS SHALL SURVIVE THE CLOSING.

12. Mold Disclosure. Purchaser expressly acknowledges that the Property may contain mold or similar organisms and hereby agrees to assume any and all liability for or arising from any such mold, organism, or other similar environmental contaminant, and to release, hold harmless, and indemnify Seller, to the fullest extent allowed under applicable law, including reimbursement of Seller's reasonable attorneys' fees expended, from any and all claims, causes of action, and costs, in law or equity, including but not limited to any personal injury, loss of property, or economic loss, that in any way relates to the presence of mold or similar organisms, or any other environmental contaminant on or in the Property.

13. Title. The Seller shall convey title to the Property free and clear of all liens, claims, encumbrances pursuant to Section 363(f) of the Bankruptcy Code to the Purchaser via a Special Warranty Deed ("**Deed**") subject only to: general real estate taxes that are not yet due and payable, and subsequent years; special taxes or assessments, if any, for improvements not yet completed; installments, if any, not due at the date hereof of any special taxes or assessment for improvements heretofore completed; building lines and building restrictions; private, public and utility easements; covenants and restrictions of record as to use and occupancy; the general exceptions to the Title Commitment (as defined herein) (which general exceptions may be removed at Purchaser's expense with the extended coverage endorsement); local, state and federal laws, ordinances or governmental regulations, including but not limited to, building and zoning laws, ordinances and regulations, now or hereafter in effect relating to the Property; building code violations; pending building code violation court cases (for the avoidance of doubt, Purchaser will not take title subject to any pre-Closing judgments or monetary liens, including any receiver liens, costs, or fees, relating to any building violations and/or building violations court cases, which judgments or liens shall attach to the proceeds of the Sale); items appearing of record or that would be shown on a survey; and leases or tenancies, if any ("**Permitted Exceptions**").

14. Survey; Title Insurance. As of the Effective Date, Seller shall have delivered any existing survey of the Property in Seller's possession, if any, to Purchaser.

(a) Purchaser, at its expense, shall be responsible for obtaining and paying for any new or updated survey (the "**Surveys**") of the Property. .

(b) Title Commitment. Title to the Property shall be good and merchantable and shall be conveyed to Purchaser free and clear of any and all liens, encumbrances, claims and interests of any kind or nature whatsoever except for the Permitted Exeptions, as defined above.

Seller has obtained and delivered (or cause to be delivered) to Purchaser a commitment, together with copies of all underlying title documents available to the Title Company, for an ALTA 2006 owner's policy of title insurance ("**Title Commitment**") issued First American Title Insurance Company, 30 N. LaSalle, Suite 2200, Chicago, Illinois 60602 ("**Title Company**"), in which Title Commitment the Title Company shall agree to insure, for the full amount of the Purchase Price, merchantable and marketable fee simple title to the Property in the name of Purchaser, free of all exceptions (excluding specifically the standard exceptions) except the Permitted Exceptions. The Title Commitment shall be conclusive evidence of good title as shown thereon.

(c)     Owner's Title Policy. At Closing, Seller, at Seller's expense, shall deliver to Purchaser an ALTA owner's title insurance policy insuring fee simple title to the Property in the amount of the Purchase Price showing Purchaser or its designee in title to the Property subject only to the Permitted Exceptions ("**Title Policy**"). Seller shall not be obligated to provide extended coverage over the general exceptions in the Title Commitment; provided, however, that Seller shall use commercially reasonable efforts to deliver such documents or affidavits as required by the Title Company and that are customarily required to provide extended coverage, including but not limited to Seller's closing deliveries set forth in Section 18(b) below.

15.     Real Estate Taxes. Seller will pay or caused to be paid all general real property taxes that are billed and levied prior to Closing with respect to the Property through the Bankruptcy Case. All general real property taxes that are levied with respect to the Property for the year prior to Closing and for the year of Closing which are not due and payable as of Closing will be prorated between Purchaser and Seller as of the business day immediately prior to the Closing Date. The proration shall be calculated based upon 100% of the most recent assessed value, tax rate and equalization factor as of the Closing Date. For purposes of clarity, the parties will use the Cook County Assessor's assessed value of the Property effective as of the Closing Date, and if the assessed value of any particular property is $0.00, then there shall be no proration with respect to such property. The parties agree that there shall be no re-proration of real estate taxes and that all real estate tax prorations shall be final at Closing.

16.     Other Prorations. (a) All items of income (including, without limitation, rents, if applicable) and expenses relating to the Property shall be apportioned between Purchaser and Seller on a cash basis as of 11:59 p.m. (local time where the Property is located) on the day immediately preceding the Closing Date and shall be adjusted against the Purchase Price due at Closing. All such prorations shall be final and binding on the parties.

(b)     Any other prorations and apportionments of closing this transaction not specifically mentioned in this Agreement shall be paid and adjusted in accordance with local custom or ordinance in the jurisdiction in which the Property is located. For the avoidance of doubt, in the event final water and sewer charges as of the Closing Date are not ascertainable, Purchaser and Seller agree to use the most recent water and sewer bill to calculate any prorations due.

(c)     Except as expressly provided herein, the purpose and intent as to the provisions of prorations and apportionments set forth in this Section 16 and elsewhere in this Agreement is that Seller shall bear all expenses of ownership and operation of the Property and shall receive all income therefrom accruing through 11:59 p.m. (local time where the Property is located) of the day preceding the Closing and Purchaser shall bear all such expenses and receive all such income accruing thereafter.

    (d) Seller shall have no obligation to provide any proration or apportionment to Purchaser for any amounts not actually received by Seller.

    (e) Cash on hand as of the Closing Date located at the Property, or in possession of the Seller, Seller's property manager, or the Receivers that is not related to tenant deposits or rental prepayments, shall be retained or credited to Seller and shall not be credited or payable to Purchaser and in no event shall alter or adjust the Purchase Price.

    (f) Purchaser shall be responsible for the transfer or acquisition of accounts and licenses regarding the Property, and the establishment of all utility services to the Property in the name of Purchaser as of Closing.

    (g) No security deposits or other tenant deposits shall be assigned at Closing.  In the event a tenant deposit was made to Seller or Seller's predecessors, Purchaser shall be responsible for repayment to the tenant(s).  Purchaser shall hold Seller harmless from any costs or liabilities related to the foregoing.

    17. <u>Closing; Location</u>.  (a) Subject to <u>Section 22</u>, the closing (the "**Closing**") of the sale of the Property shall occur at offices of the Title Company in downtown Chicago, on that date which is fourteen (14) days after the entry of the Sale Order or as otherwise mutually agreed upon in writing by the Seller and Purchaser (the "**Closing Date**").

    (b) <u>Escrow Closing</u>.  This Sale shall be closed through an escrow with the Title Company, in accordance with the general provisions of the customary form of deed and money escrow agreement then in use by the Title Company, with such special provisions inserted in such escrow agreement as may be required to conform with this Agreement.  Upon the creation of such an escrow, anything herein to the contrary notwithstanding, payment of Purchase Price and delivery of Deed shall be made through the escrow and this Agreement shall be deposited in the escrow.  For the avoidance of doubt, the entire amount of the Deposit shall be applied toward the Purchase Price.

    18. <u>Deliveries at Closing</u>.  (a) At Closing, Purchaser shall deliver or cause to be delivered to Seller the following:

      (i) Wired funds to the Title Company in the amount of (A) the Purchase Price and (B) any costs or expenses allocated to Purchaser in accordance with the terms and provisions of this Agreement, less the total amount of Deposit and any applicable credits;

      (ii) Such affidavits, resolutions and other documents requested by Seller or required by the Title Company for a legal conveyance of real estate in the Cook County, Illinois, or otherwise required by the Title Company to issue the Title Policy; and

      (iii) Evidence reasonably satisfactory to Seller and Title Company that the person executing the closing documents on behalf of Purchaser has full right, power, and authority to do so.

    (b) At Closing, Seller shall deliver or cause to be delivered to Purchaser the following:

    (i)      The Sale Order;

    (ii)     Deed to the Property, together with appropriate real estate transfer declaration forms;

    (iii)    Certificate as provided in the Foreign Investment in Real Property Tax Act of 1980 (FIRPTA);

    (iv)    Evidence reasonably satisfactory to Purchaser and Title Company that any person executing the closing documents on behalf of Seller is properly authorized to do so;

    (v)     Full payment certificate or other governmental requirement in order to permit recordation of the Deed issued by the City of Chicago;

    (vi)    Certificate of Zoning Compliance issued by the City of Chicago for any Property that contains five or fewer dwelling units;

    (vii)   Quit Claim Bill of Sale;

    (viii)  Assignment of all leases encumbering the Property;

    (ix)    Assignment of the Assumed Service Contracts;

    (x)     Such affidavits, resolutions and other documents requested by Seller or required for a legal conveyance of real estate in the Cook County, Illinois, or otherwise required by the Title Company to issue the Title Policy; and

    (xi)    Any documentation reasonably requested by the Title Company in order to issue the extended coverage endorsement (so long as the documentation is consistent with the terms hereof).

19.    <u>Closing Expenses</u>.  Purchaser shall pay for recording the Deed. Seller shall pay all costs related to title search fees and the base title insurance premium for the Title Policy to be issued to Purchaser. Purchaser shall pay for all endorsement charges (including extended coverage) and the title insurance premium for any loan policy, including endorsement charges related thereto. All escrow fees and Title Company closing charges shall be shared equally by Seller and Purchaser, except Purchaser shall pay any escrow fees and other charges related to Purchaser's loan, if any. All state and county transfer taxes shall be paid by Seller. The costs of the City of Chicago transfer taxes shall be allocated between Seller and Purchaser as provided in the applicable ordinance. All other closing costs shall be allocated as customary in the City of Chicago.

20.    <u>Representations by Seller</u>. Seller represents and warrants to Purchaser as follows:

    (a)    <u>Existence; Authority</u>. Subject to the Sale Order, Seller has the requisite power and authority to enter into this Agreement and to execute and deliver Seller's closing documents.

    (b)    <u>Title</u>. Seller shall have at Closing good and marketable title to and interest in the Property with the authority to sell and transfer such title and interest to Purchaser under this Agreement free and clear of all liens, claims and encumbrances to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

    (c)    <u>FIRPTA</u>. Seller is not a "foreign person", "foreign partnership", "foreign trust" or "foreign estate", as those terms are defined in Section 1445 of the Internal Revenue Code.

21.    <u>Representation by Purchaser</u>. Purchaser hereby represents and warrants to, and covenants and agrees with, Seller as to the following matters, with the understanding that Seller is relying on these representations, warranties and covenants in effecting the transactions contemplated hereby:

    (a)    This Agreement shall be binding and enforceable against Purchaser in accordance with its terms, and upon Purchaser's execution of any additional documents contemplated by this Agreement, the additional documents shall be binding and enforceable against Purchaser in accordance with their terms. The execution and delivery of the Agreement and Purchaser's performance of the obligations hereunder does not require any consents or approvals of any third persons.

    (b)    Neither Seller nor its servicers, employees, representatives, brokers, agents or assigns, have made any representations or warranties, implied or expressed, relating to the insurability or condition of the Property or the contents thereof.

    (c)    Purchaser has not relied on any reports, documentation, or other information relating to the Property, obtained by or provided by Seller in making a decision to purchase the Property; but rather, Purchaser has relied solely on its own independent assessment of the Property, including but not limited to occupancy and any leases that may exist.

    (d)    Purchaser represents that all regulatory and third-party approval necessary to consummate the Sale by the Purchaser (other than Bankruptcy Court approval) has been obtained.

    (e)    Purchaser represents that the Sale is not subject to (1) further due diligence by Purchaser, or (2) any other contingency that would prevent Purchaser from closing on the Sale (subject to <u>Section 5</u> above)

    (f)    Purchaser represents that it is a knowledgeable, experienced and sophisticated purchaser of real estate and that it is relying solely on its own expertise and that of Purchaser's consultants in purchasing the Property. Purchaser will conduct such inspections and investigations of the Property as purchaser deems necessary and shall rely upon same. Upon closing, Purchaser shall assume the risk that adverse matters, including, but not limited to tenant defaults, may not have been revealed by Purchaser's inspections and investigations.

   (g) Purchaser fully understands the transaction contemplated by this Agreement and has such knowledge and experience in financial, business, and real estate matters that Purchaser is capable of evaluating the merits and risks of the investment in the Property. Purchaser has fully reviewed this Agreement inclusive of all disclaimers and waivers, with its counsel and understands the significance and effect thereof.

   (h) Purchaser has been advised and is aware that there may be existing occupants of the Property and that Seller is under no obligation to have any occupants vacate the Property prior to Closing.

   (i) Purchaser represents that it has the financial capabilities to consummate the Sale and no outside financing is required for Purchaser to consummate the Sale; *provided, however,* in addition the requirements set forth in Paragraph 8 of this Agreement, Purchaser shall provide evidence of such financial capabilities to consummate the Sale to the Trustee and City of Chicago upon reasonable notice prior to the execution of this Agreement.

All representations, warranties and covenants made by Purchaser hereunder are true on the date hereof, shall be true as of the Closing and shall survive Closing.

  22. <u>Conditions to Seller's Performance</u>**.** Seller shall have the unilateral right, at Seller's sole and absolute discretion, but subject to Purchaser's rights under <u>Section 5</u>, to extend the Closing Date or to terminate the Agreement if:

   (a) The Purchase Price is insufficient to pay the sum of the closing costs, taxes, commissions and any liens on or obligations secured by the Property that Seller has agreed to pay hereunder; or

   (b) The Bankruptcy Court has not entered a final Sale Order approving the Agreement in form and substance satisfactory to Seller, Purchaser and the Trustee.

  In the event Seller elects to terminate this Agreement as a result of any of the foregoing, prior to the filing of the Bankruptcy Case, the Deposit shall be returned to Purchaser and the parties shall have no further obligation under this Agreement except the rights and obligations that by their intent survive termination.

  23. <u>Personal Property</u>. Purchaser acknowledges and agrees that items of equipment, fixtures, and other items of personal property ("**Personalty**") shall not be included in the sale of the Property or the Purchase Price unless each item is specifically described and referenced in this Agreement. Any Personalty equipment, fixtures, and other items of personal property at or on the Property may be subject to claims by third parties and, therefore, may be removed from the Property prior to or after the Closing Date. Seller makes no representation or warranty as to the condition of any Personalty or any personal property, title thereto, or whether any Personalty or personal property is encumbered by any liens. Purchaser assumes full responsibility for any Personalty and other items of personal property remaining on the Property at the time of the Closing. ANY PERSONALTY OR PERSONAL PROPERTY SOLD BY SELLER SHALL BE ACCEPTED BY PURCHASER ON AN "AS IS, WHERE IS" BASIS WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND OR NATURE, AND SPECIFICALLY EXCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE.

24. <u>Condemnation</u>. In the event of any threatened, commenced or consummated proceedings in eminent domain affecting all or a material portion of the Property prior to Closing, Seller shall promptly notify Purchaser in writing, and Purchaser may, at its option, by delivering written notice to Seller within ten (10) days after Purchaser becomes aware or is notified of such proceedings, either (a) terminate this Agreement, in which the Deposit shall be refunded to Purchaser, or (b) accept the Property subject to the proceedings, in which event Seller shall assign to Purchaser at Closing its entire right, title and interest to any condemnation award.

25. <u>Casualty</u>. In the event of damage to the Property by fire, vandalism, theft, weather damage, water damage or other casualty from the date of Purchaser's Inspections prior to the Closing Date (a "**Casualty Event**"), Seller shall immediately notify Purchaser of such Casualty Event, and Purchaser may elect, by written notice to be delivered to Seller on or before the sooner of (a) the twentieth (20th) day after Purchaser's receipt of such notice from Seller, or (b) the Closing Date, to either: (i) close the transaction contemplated by this Agreement and receive all insurance claims and proceeds payable to Seller as a result of such Casualty Event, if any, with the same being paid or assigned to Purchaser at Closing, or (ii) terminate this Agreement, and receive a return of the Deposit, and upon such refund, neither party hereto shall have any further rights or obligations under this Agreement whatsoever, except for such rights and obligations that, by the express terms hereof, survive any termination of this Agreement. A Casualty Event shall only be deemed to exist in the event the cost to cure such exceeds Five Hundred Thousand Dollars ($500,000.00).

26. <u>Default; Remedies</u>. (a) <u>Seller Default</u>. If Seller defaults in its material obligations hereunder and provided Purchaser is not in default under this Agreement, Purchaser shall have the right, as its sole and exclusive remedy, to terminate the Agreement and the Deposit shall be paid to Purchaser within three (3) business days and, upon receipt of the Deposit by Purchaser, the parties shall have no further obligation to each other.

(b) <u>Purchaser Default</u>. In the event Purchaser shall fail to comply with any of its material obligations hereunder on or prior to the Closing, Seller may terminate this Agreement, be paid the balance of the Deposit, and Seller shall have all rights and remedies available at law and equity.

27. <u>Real Estate Broker</u>. In the event the Seller engages a real estate broker to market the Property, at Closing, Seller shall be responsible for paying the commission to broker with respect to the transaction contemplated herein pursuant to a separate written agreement. Except as set forth in the preceding sentence, each party hereby represents and warrants to the other party that it has not submitted this transaction to any broker, finder or other agent whatsoever, so as to cause any broker, finder or agent to be entitled to a broker's or finder's fee or commission with respect to this transaction. Each party hereby agrees to indemnify and hold the other free and harmless from and against all loss, cost, and injury suffered as a result of either party's breach of the foregoing warranty.

28. <u>Notices</u>. Any notice required or permitted to be delivered under this Agreement shall be deemed to be delivered (a) whether or not actually received, when deposited in the United States mail, postage prepaid, certified or registered mail, return receipt requested, (b) when received, if delivered personally or sent by a nationally recognized overnight carrier, all charges prepaid, or (c) when received, when sent by electronic transmission (and accompanied by a copy sent by United States mail, first class mail, postage prepaid) and addressed to the Seller or Purchaser, as the case may be, at the addresses set forth below or at such other address as such party may designate by written notice to the other:

To the Seller:                                 Clark Hill PLC
Attn: Chad M. Poznansky
130 E. Randolph, Suite 3900
Chicago, Illinois 60601
Email: cpoznansky@clarkhill.com

To the Purchaser:                   __The Property Law Group LLC_____
__641 E Pershing Rd Ste E_____
__Chicago, IL 60653_____
_____
Phone: __(312) 672-2299_____
Fax: _____
Email: __elucas@plgesq.com____

and

_____
_____
_____
_____
Phone: _____
Fax: _____

Email: _____

To the Trustee:                           Michael Slade, UMB Bank N.A.
120 6th Street South, Suite 1400
Minneapolis, MN 55402
Phone: (612) 337-7004,
Email:Michael.slade@umb.com

and

James W. Kapp III
McDermott Will & Emery LLP
444 West Lake Street, Suite 4000
Chicago, IL 60606-0029
Phone: (312) 984-7588
Email: JKapp@mwe.com

       29.     <u>Entire Agreement</u>.  This Agreement contains the entire agreement between Seller and Purchaser concerning the sale of the Property, and no statement, agreement, representation, or understanding shall be binding on either party unless it is contained in this Agreement.  No

modification of this Agreement shall be binding on either party unless in writing and signed by the parties.

30. <u>Building Code Violations.</u>  Purchaser acknowledges there may exist building code violations against the Property, known or unknown.  Purchaser hereby agrees to take the Property subject to building code violations and proceedings related to building code violations.  Purchaser shall be solely responsible in making a determination relative to building code violations.  Purchaser's consumption of the transaction shall be deemed approval of the condition of the Property, including existing building code violations.  For the avoidance of doubt, Purchaser will not take title subject to any judgments or monetary liens, including any receiver liens, costs, or fees, relating to any such building violations and/or building violations court cases, which judgments and liens shall attach to the proceeds from the Sale (except the Deposit, Break-Up Fee and Expense Reimbursement).

31. <u>Evictions</u>.  In the event Seller (or Seller's management company or a Receiver) has filed an eviction proceeding against one or more tenants, upon Closing, Purchaser shall maintain the proceeding and take all necessary steps to replace Seller as the plaintiff.  Purchaser shall be responsible for all costs and expenses, including attorneys' fees, arising from the eviction proceeding after Closing.

32. <u>Exculpation</u>. Except for the return of the Deposit from the Title Company, Purchaser agrees to look solely to Seller's interest in the Property for the satisfaction of any liability or obligation arising under or in connection with this Agreement, the transactions contemplated hereby or the documents executed pursuant hereto, or for the performance of any of the covenants, warranties or other agreements contained herein or therein, and Purchaser shall not collect or attempt to collect any judgment or other amounts out of any assets of Seller or Trustee other than Seller or Trustee's interest in the Property. Further, Purchaser agrees that, other than the remedies set forth under <u>Section 26</u>, including the return of the Deposit, it does not have and will not have any claims or causes of action against any disclosed or undisclosed officer, director, employee, trustee, shareholder, partner, member, principal, parent, subsidiary or other affiliate of Seller or Trustee, or any officer, director, employee, trustee, shareholder, partner, member or principal of any such parent, subsidiary or other affiliate, arising under or in connection with this Agreement, the transactions contemplated hereby or the documents executed pursuant hereto. The terms of this <u>Section 32</u> shall survive the Closing and any termination of this Agreement for any reason.

33. <u>Recordation</u>. Purchaser agrees not to record this Agreement or any memorandum hereof.

34. <u>WAIVER OF JURY TRIAL</u>. THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS CONTRACT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS.

35. <u>Miscellaneous</u>. (a) <u>Assignment</u>. Purchaser may not assign this Agreement or Purchaser's rights hereunder without the prior written consent of Seller, which consent may be withheld by Seller for any reason or no reason.  No permitted assignment of Purchaser's rights under this Agreement will be effective against Seller until an executed counterpart of the instrument of assignment has been delivered to Seller and Seller has been furnished with the name and address of the assignee.

(b) <u>Time</u>.  Time is of the essence of this Agreement.  If a time period would expire on a weekend day or a week day that is not a full business day, the time period will be extended to the next week day that is a full business day.

(c) <u>Amendment</u>.  No provision of this Agreement may be waived, modified, amended, discharged or terminated except by an instrument signed by the party against whom the enforcement thereof is sought, and then only to the extent set forth in the instrument.

(d) <u>Governing Law</u>.  This Agreement will be governed by, and construed in accordance with, the law of the State of Illinois.

(e) <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Agreement.  Receipt of an executed signature page to this Agreement by facsimile or other electronic transmission shall constitute effective delivery thereof.

(f) <u>Binding Effect</u>. Subject to Paragraph 35(a), this Agreement will be binding on and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and permitted assigns.

(g) <u>Effective Date/Court Approval</u>.  The Effective Date of this Agreement shall be the last date that either Purchaser or Seller executes this Agreement.  Except as set forth herein, this Agreement shall be null and void should the Bankruptcy Court not enter a Bid Procedures Order or Sale Order approving this Agreement.

[SIGNATURE PAGE TO FOLLOW;

BALANCE OF PAGE INTENTIONALLY BLANK]

IN WITNESS WHEREOF, this Agreement has been executed as of the date first above appearing.

PURCHASER:  SELLER:

*[signature: Ebony Dawn Lucas]*  **BHF CHICAGO HOUSING GROUP C LLC, an Illinois limited liability company**

By: Better Housing Foundation
Its: Sole Member and Manager

By: Portfolio Seventeen, LLC
Its: Managing Member
Name: Ebony Lucas

By:_____
      Andy Belew, President

Agreed to and approved by:

**UMB BANK, N.A., not individually, but solely as Successor Trustee**

By: _____
Its: _____

Agreed to as Third Party Beneficiary:

**CITY OF CHICAGO**

By: _____
Its: _____

*EXECUTION VERSION*

# EXHIBIT A

# LIST OF PROPERTIES

| Address | PINS |
| --- | --- |
| 63-73 E. 69th St., 6900-6908 S. Michigan Ave, Chicago, IL 60637 | 20-22-313-023-0000 |
| 444- 46 E. 50th St, 4952-56 S. Vincennes Ave, Chicago, IL 60615 | 20-10-216-042-0000 |
| 734-36 E. 95th St, Chicago, IL 60619 | 25-03-433-021-0000 |
| 1418-20 E. 67th Place, Chicago, IL 60637 | 20-23-402-010-0000 |
| 3652-3654 Indiana Ave, Chicago, IL 60653 | 17-34-308-024-0000, 17-34-308-025-0000 |
| 3656-3658 S. Indiana Ave, Chicago, IL 60653 | 17-34-308-026-0000 |
| 4956-4958 S. Michigan Ave, Chicago, IL 60615 | 20-10-113-037-0000 |
| 5715-5717 S. Indiana Ave, Chicago, IL 60637 | 20-15-116-003-0000 |
| 6605-6607 Greenwood Ave, Chicago, IL 60637 | 20-23-125-002-0000 |
| 6609-6611 Greenwood Ave, Chicago, IL 60637 | 20-23-125-002-0000 |
| 6800-02 S. Clyde Ave, Chicago, IL 60649 | 20-24-408-013-0000 |
| 8056 S. Ellis Ave, Chicago, IL 60619 | 20-35-110-027-0000 |
| 8100 S. Evans Ave, Chicago, IL 60619 | 20-34-222-018-0000 |
| 8200 S. Evans Ave, Chicago, IL 60619 | 20-34-230-014-0000 |
| 9032-34 S. Dauphin Ave, Chicago, IL 60619 | 25-02-112-015-0000 |
| 9300 S. Bishop St, Chicago, IL 60620 | 25-05-318-018-0000 |
| 9942 S. Walden Pkwy, Chicago, IL 60643 | 25-07-402-020-0000 |

*EXECUTION VERSION*

# EXHIBIT B

# CONTRACT RECEIPT AND JOINDER

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned, the Title Company[1] named in the Agreement, hereby agrees to be bound by the provisions of the Agreement relating to the holding and disbursement of all monies paid to the undersigned in escrow, and to disburse such sums strictly in accordance with the terms of such Agreement.

Intending to be legally bound, the undersigned has caused this Joinder to be executed by its duly authorized representative the ____ day of _____, 2020

                FIRST AMERICAN TITLE
                INSURANCE COMPANY

                By: _____
                Name: _____
                Title: _____

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed in the Real Estate Purchase and Sale Agreement.