**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN THE MATTER OF ) | |
| ) | |
| BHF HOUSING GROUP C (LLC) ) | Chapter 11 |
| (ERNST), ) | |
| ) | Case No.  20-16567 |
| Debtor, ) | Hon. Jack B. Schmetterer |

**AMENDED OBJECTION TO CONFIRMATION OF AUCTION**

This objection to the confirmation of the auction of Portfolio C is brought on behalf of Dearborn Realitst Board, Ebony Lucas, Kevina Bronaugh, and similarly situated investors, with additional objection letters from Pat Dowell (3rd Ward Alderman), Leslie Hairston (5th Ward Alderman), Jeanette Taylor (20th Ward Alderman).

The Better Homes Foundation ("BHF") Portfolio C was auctioned on November 5, 2020. The portfolio includes 17 buildings (181 units) in predominately Black neighborhoods in Chicago. The auction sale process was determined by the debtor and entered into an order by the court. The process required the sale of the properties as a full portfolio. The bidders at the auction included two large conglomerate investors who previously owned, and sold properties to, BHF. The winning bidder at the sale was Saybrook Capital, a California based private equity firm. This objection is being filed on the following bases:

(1) The portfolio sale requirement, created a major barrier that disparately impacted Black, local investors by preventing meaningful participation by individuals representative of the communities where the properties are located, and resulted in a system by which only the large conglomerate, majority owned firms were able to bid;

(2) The purchase price of the auction was considerably less than offers received for the same properties when offered for sale individually. The sale of the properties at a price significantly less than what they could have been sold for, if sold separately, results in the devaluation of assets in predominately Black neighborhoods and causing an irreparable disparate impact;

(3) The sale of south side properties to out of state investors has continued to result in a disproportionate number of low income housing to be concentrated in those communities and cause the dissipation of home ownership opportunities.

Property ownership is one of the main avenues Americans have for building wealth. According to the Federal Reserve, there is a long-standing wealth gap between Black and white households — the median net worth of white families is nearly 10 times that of Black families. This makes it especially difficult for Black people to purchase real estate.

As a result of the long history of discrimination against Blacks in real estate, The Fair Housing Act ("FHA") provides that, "it shall be unlawful to refuse to sell… or otherwise make unavailable… a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 USC Sec. 360(4)(a). Second, it states, "It shall be unlawful for any person or other entity whose business includes engaging in real estate related transactions to discriminate against any person in making available such a transaction." Protections under the FHA extend to both public and private transactions. In *Texas Department of Housing v Inclusive Communities Project, Inc.*, the US Supreme Court held that "otherwise make unavailable is of central importance to the [determination]… that the Fair Housing Act encompasses disparate-impact claims." 576 US 13-1371, 11 (2015). There, the Court held that "Congress' use of the phrase 'otherwise make available' refers to the consequences of an action rather than the actor's intent." *Id* at 11.

"Recognition of disparate impact claims under the FHA… permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment." *Id*.

There is no doubt that there are Black investors who purchase properties on the south side of Chicago. There are 1,110 Black members of the Dearborn Realtist Board, Chicago's oldest Black real estate trade organization. There are another 170 active investors and members of the South Side Builders Association. On the south side of Chicago over the past 12 months, 432 multi-family buildings have sold at an average of $70 per unit and an average marketing time of 67 days. No one can deny that there is a demand for south side muli- family buildings or that Black investors participate actively in real estate transaction.

The case now before the court was not the first time that the BHF buildings were offered for sale. The initial marketing of the properties for sale occurred due to housing code violations. The sale was ordered by Circuit Court Judge Leonard Murray. There, the court put protections in place to ensure local participation and Black representation in the sale and purchase of the properties. Those protections included ensuring that a local, Black broker was involved on the listing team and requiring that the buildings be sold to separate investors rather than as a portfolio. During that process, a Black commercial real estate broker with Marcus and Millichap, Anthony Hardy, was selected to list the properties. While the properties were listed, Hardy showed the properties to 47 investors and received 17 cash offers for an average of $63,000 per unit. Before the offers could be submitted for approval to the court, the instant bankruptcy was filed. Following the bankruptcy, being fully aware of multiple offers on the buildings by qualified investors, the debtor requested that the properties be sold as a portfolio, thereby squeezing out the ability of local, Black investors from participation in the process. No separate communication was sent to the

previous bidders on the properties about the auction, and no consideration was given to their previous offers. None of the offers were presented to the bankruptcy court, even though those offers were higher per unit than the stalking horse bids submitted to the court.

In order to establish a disparate impact, a plaintiff must show that an action has "a disproportionately adverse affect on minorities" that is "otherwise unjustified by a legitimate rationale." *Ricci v DeStefano*, 557 US 559 (2009). After a plaintiff makes a showing of disparate impact, a defendant must "prove that the challenged practice is necessary to achieve one or more substantial, legitimate, non-discriminatory interests." Sec. 100.500(c)(2). Once this is satisfied, "a plaintiff may prevail by upon proving that the substantial, legitimate, non-discriminatory interests supporting the challenged practice can be served by another practice that has a less discriminatory effect." 100.500(c)(3).

The auction process started with an opening bid of $5,000,000 and ended with a sales price of approximately $48,000 per unit. This amount is significantly less than the $63,000 per unit that the debtor could have sold the buildings for if they had been sold separately. Further, no consideration in value was given for the buildings, which are located in vastly different neighborhoods and are in vastly different conditions. For example, while the court refers to the portfolio as "low income housing," 4952 S. Vincennes is a 6 unit, new construction, condominium quality building with roof top decks and duplex units that could create much needed home ownership opportunities in Bronzeville. Based on Co-Star and MLS reports, units of similar condition are selling for an average of $150,000 per unit. The lack of participation in the portfolio sale by the numerous investors in the community; participation by the same 3 majority owned real estate conglomerates, some of whom previously owned the properties and sold them to the debtor; and significant undervaluation of the properties, presents a prima facia case of disparate impact.

The value of residential real estate has a heavy influence on the large gaps between race and wealth. The devaluation of properties in Black neighborhoods has a long history within the web of systemic racism in America. Perry, Andre, et al. Brookings, 2018, pp. 1–28, *The Devaluation of Assets in Black Neighborhoods*. Metropolitan areas with greater devaluation of black neighborhoods are more segregated and produce less upward mobility for the black children who grow up in those communities. *Id* at 3.

According to *The Devaluation of Assets in Black Neighborhoods,* supra, if properties in Black neighborhoods were priced equally as those in white neighborhoods, Black children coming of age in the 1990s and 2000s would have had much more wealth to draw upon to pay for things like private schooling, tutoring, travel, and educational experiences, as well as higher education and greater access to higher scoring schools in the suburbs. Greater property wealth may have also facilitated higher rates of entrepreneurship among Black parents, which may have positively affected children. In fact, there is a positive correlation between the valuation of properties in black neighborhoods and upward mobility of black children whose parents had incomes at the 25th percent of the national income distribution. In other words, Black children born to low-income families had higher income as adults if they grew up in a metro area that valued Black property closer to its observable market characteristics.

In the case now before the court, there is no clearer showing that the portfolio sales process had a disproportionately adverse affect on minority investors who were shut of meaningful participation in the process. Those same investors are again disparately impacted because they own and live in the communities where the properties are located and are directly impacted by the devaluation of the properties. The auction process made it so that the properties were unavailable

for purchase by qualified, interested individuals who would have community connections and would have paid more for the properties. Further, there is also no question that the sale of such a large number of units to one out of state private equity will cause irreparable and long-term damage to the community. There is no legitimate, non-discriminatory interest that makes a portfolio sale a necessary requirement. The sale of the properties to one investor does not achieve any substantial goal, and in fact, it caused the sales to be *lower* than what they would have been had the properties been able to purchased individually. The sale actually *frustrates* the ultimate goal in this case, which is to ensure that the creditors are made whole.

It is not in the best interest of the creditors or the community for the court to approve the sale of Portfolio C. The sale creates a clear disparate impact on the people who live, own, and are vested in the neighborhoods where the buildings are located. In objecting to the sale, we are not asking that the court repair the long history of systemic racism that has led to the disenfranchisement of Blacks in real estate, we are simply requesting that the court not contribute to it. "Disparate impact liability mandates the removal of artificial, arbitrary, and unnecessary barriers." *Griggs v Duke Power Co.*, 410 US 424 (1971). Where a court finds that a practice has a disparate impact, it is limited to remedial orders consistent with the constitution. *Texas Dept. of Housing, supra* at 22. "Remedial orders in disparate impact cases should concentrate on the elimination of the offending practice that arbitrarily operates invidiously to discriminate on the basis of race." *Id.*

The objectors have a valid claim of disparate impact which should must be addressed and redressed by this court. While BHF, this Court, nor the high bidder are the cause of the systemic racism in America that continually denies Black and minority participation in wealth building opportunities, the Court has the opportunity remediate the damage caused by the process and avoid

further litigation by denying confirmation of the sale and proceeding with the sale in a manner in which Black people who live, work, and have a vested interest in the neighborhoods where the properties are located have a valid opportunity to participate in the acquisition of the properties in the portfolio. Affidavits and letters of objection are attached for the court's review.

                                                    RESPECTFULLY SUBMITTED,

                                          By: _____
                                                Ebony Lucas

Ebony Lucas
Attorney No.: 6292082
641 E. Pershing St. Ste. E
Chicago, IL 60653
Telephone: (312) 672-2299
Email elucas@plgesq.com